Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 7113 | DATE | 2/20/2004 |
| CASE TITLE | Lacey vs. William Chrysler Plymouth, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ______.

(3) ☐ Answer brief to motion due______. Reply to answer brief due______.

(4) ☐ Ruling/Hearing on ______ set for ______ at ______.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(7) ☐ Trial[set for/re-set for] on ______ at ______.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ______ at ______.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for partial summary judgment is granted as to Counts I and III and denied as to Counts V and VI. William Chrysler's motion for summary judgment is denied. Because plaintiff failed to answer or otherwise respond to defendants' counterclaim, default judgment is entered on liability in favor of defendants on the counterclaim, with damages to be proven at trial. Final pretrial materials are to be submitted to chambers by 2/26/04. Pretrial conference is set for 2/27/04.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | FEB 23 2004 date docketed | 33 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 04 FEB 20 PM 4:30 | 2/20/2004 date mailed notice | |
| MD | courtroom deputy's initials | FILED-ED 10 Date/time received in central Clerk's Office | MD mailing deputy initials | |

DOCKETED
FEB 2 3 2004

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE LACEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 7113 |
| | ) | Judge Joan H. Lefkow |
| WILLIAM CHRYSLER PLYMOUTH INC. and DAVID GREATHOUSE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Michelle Lacey ("Lacey"), has filed a six-count complaint against defendants, William Chrysler Plymouth ("William Chrysler"), an automobile dealership, and David Greathouse ("Greathouse"), alleging violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* (Count I), the Fair Credit Reporting Act ("FCRA")[1], 15 U.S.C. § 1681 *et seq.* (Count II), the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* (Count III), the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 *et seq.* (Count IV), and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* (Counts V and VI). Defendants have filed a counterclaim alleging that Lacey breached her contract with William Chrysler and delivered a bad check in violation of 720 ILCS 5/17-1a and 5/17-1(B)(d). Lacey has not answered or otherwise responded to the counterclaim. Lacey has filed a Motion for Partial Summary Judgment on Liability on Counts I, III, V and VI.[2]

[1]Lacey has informed the court that she will dismiss her FCRA claim. Thus, the court will not address that claim.

[2]Lacey has withdrawn her Motion for Summary Judgment on Count IV. (Pl. Memo. in Resp. to Def. Motion for Summ. J., at note 1.)



Defendants have filed a Motion for Summary Judgment on Counts I, III, and IV and also seek entry of default judgment on their counter-complaint. This court has jurisdiction over Counts I-IV pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the remaining counts and counterclaims pursuant to 28 U.S.C. § 1367(a). For the reasons stated below, Lacey's Motion for Partial Summary Judgment is granted as to Counts I and III and denied as to Counts V and VI. William Chrysler's Motion for Summary Judgment is denied. However, because Lacey has failed to answer or otherwise respond to defendants counterclaims, the court enters default judgment on liability in favor of defendants on those counterclaims.

**SUMMARY JUDGMENT STANDARDS**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most

favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

William Chrysler is a car dealership in Chicago, Illinois. William Chrysler is involved in credit evaluation, negotiation of credit terms and the sale of credit contracts to third parties in the secondary market. (Pl. L.R. 56.1 ¶ 42.) However, William Chrysler does not make any ultimate decisions regarding who is accepted and rejected by credit lenders. (Def. Resp. to Pl. L.R. 56.1 ¶ 42.) William Chrysler handles more than 150 credit applications for consumers per year. (Pl. L.R. 56.1 ¶ 41.)

On Saturday, June 8, 2002, Lacey received in the mail an advertisement from William Chrysler that promised a prize of between $10 and $10,000 simply for going to William Chrysler. (Pl. L.R. 56.1 ¶ 6.) In response to the advertisement, Lacey went to William Chrysler that day. She drove to William Chrysler in her 1997 Pontiac Transport. (*Id.* ¶ 6.) When Lacey arrived, she saw two women sitting at a table. She asked them for her prize and received an envelope containing $10. (*Id.* ¶ 8.) The women at the table introduced Lacey to a salesman, Jay Hester. (*Id.* ¶ 10.) Hester proceeded to show Lacey a Chrysler Town & Country minivan, priced around $25,000. (*Id.* ¶ 12.) Lacey test drove the Town & Country, liked it, and inquired about purchasing it. (*Id.* ¶ 13.) After Hester explained to Lacey what she needed to purchase the vehicle, Lacey filled out and signed a credit application. (Lacey Dep. at 31.) Hester then pulled Lacey's credit report. (*Id.*) Soon thereafter, Hester came back and told Lacey that she did not

qualify to purchase the vehicle because she had a recently discharged bankruptcy.[3] (*Id.*; Pl. L.R. 56.1 ¶ 14.) Hester did not give Lacey a written notification of why she did not qualify to purchase the vehicle. (Pl. L.R. 56.1. ¶ 15.)

Lacey claims that she then informed Hester that the car she was currently driving, the 1997 Pontiac Transport, was not included in her bankruptcy proceedings. Because she needed the car to get to work and to transport her family, she had reaffirmed that debt and was going to continue making payments on it. (*Id.* ¶ 16.) However, Lacey also states that Hester was under the impression that the debt on the Transport was discharged in bankruptcy. (Lacey Dep. at 39; Def. L.R. 56.1 ¶ 14.)

Hester then told Lacey that she could qualify for a less expensive vehicle, a Plymouth Voyager minivan, priced around $19,000. He told her that she could get the Voyager for a $750 cash down payment.[4] (Pl. L.R. 56.1 ¶ 15.) Lacey did not have the money for the down payment at the time, so she returned to her house and gathered her check stubs, her bankruptcy discharge,

---

[3]Defendants state that Lacey "chose not to attempt financing for the Plymouth Town & Country." (Def. L.R. 56.1 ¶ 4.) In support of this statement, defendants cite to the affidavit of Greathouse dated July 21, 2003. Lacey has moved to strike the Greathouse affidavit, arguing that the affidavit fails to lay the proper foundation as to why Greathouse is competent to testify about William Chrysler's business practices. Lacey also points out that the affidavit contains two paragraphs 6. The first paragraph 6 states that "Plaintiff could not obtain financing for the Plymouth Town & Country," while the second states that "Plaintiff chose not to attempt financing for the Plymouth Town & Country." The court denies Lacey's motion to strike the entire affidavit, but strikes both paragraphs 6. First, the paragraphs are inconsistent. More importantly, Lacey states, and defendants admit, that Hester, not Greathouse, told her that "because of her credit history she did not qualify to purchase the Town & Country." (Def. Resp. to Pl. L.R. 56.1 ¶ 14.) The affidavit does not establish how Greathouse knew that Lacey "chose not to attempt financing." Thus, both paragraphs 6 lack foundation. The court accepts as true Lacey's statement that Hester told her that "she did not qualify to purchase the Town & Country."

[4]Lacey first states that Hester told her she could get the Voyager for a $750 down payment. (Lacey Dep. at 34.) Lacey then states that the defendants asked for a down payment of $1500. (*Id.* at 36-37.) Defendants do not dispute either amount. Based on the context of each statement, it appears that the parties agreed to a down payment of $750 cash and a post-dated check for $750.

and her reaffirmation papers. She then went to her father's house and borrowed $350 cash. (*Id.* ¶ 18.)

Lacey returned to William Chrysler that day and gave the money and paperwork to Hester. Hester reviewed the paperwork and then took it to Greathouse, a finance manager. Greathouse examined the paperwork and asked Lacey when she could deliver the remaining $400 of the down payment. (*Id.* ¶ 19.) Lacey replied that she could deliver the remaining $400 the following Monday morning. Greathouse told Lacey to leave a check post-dated to July 13, 2002, for $750, the balance of the $1500 down payment. (*Id.* ¶ 20.) Lacey claims that at the time she wrote the check, she knew that she did not have sufficient funds in her bank account to cover the check. However, she claims that she anticipated returning to work and was expecting sufficient funds to be deposited to her account on July 7, 2002. (Lacey Dep. at 79.)

Lacey claims that Greathouse gave her a piece of paper directing her to tell any finance company that called that her monthly income was $3200 and that she had put $500 down. (Pl. L.R. 56.1 ¶ 21.) Greathouse denies this. (Greathouse Aff. of July 21, 2003 ¶ 12.) Greathouse then had Lacey sign a blank retail installment contract ("RIC").[5] He told her that he would try to get her a monthly payment right around what she was paying for her Pontiac Transport. (Pl. L.R. 56.1. ¶ 22.) Other than the receipt for her $350 down payment, Lacey received no paperwork on that day.[6] (*Id.* ¶ 23.)

---

[5]Defendants deny this but fail to cite to any portion of the record which contradicts the assertion. (Def. Resp. to Pl. Statement of Uncontested Facts ¶ 22.) Defendants argue that Lacey's statement is not credible because she has failed to produce a copy of the blank RIC. The court fails to see how Lacey's failure to produce a copy of the blank contract, which she claims she signed and left with Greathouse, has any relevance to the truth or falsity of her statement.

[6]Defendants deny this but fail to cite to any portion of the record which contradicts the assertion. (Def. Resp. to Pl. Statement of Uncontested Facts ¶ 23.)

Lacey then drove away in the Plymouth Voyager and left her Pontiac Transport at William Chrysler. (*Id.* ¶ 24.) She claims that Hester explicitly told her that she could trade in the Transport. (*Id.* ¶ 25.) However, Greathouse claims that Williams Chrysler never agreed to accept the Transport as a trade in. (Greathouse Dep., July 21, 2003 ¶ 10.)

Lacey and her children returned to William Chrysler the following Monday, June 10, 2002, with the $400 she still owed on her down payment. (Pl. L.R. 56.1 ¶ 26.) Hester brought the Pontiac Transport from the lot, and Lacey and her children cleaned out their belongings from the Transport and transferred them to the Plymouth Voyager. The license plates from the Transport were transferred to the Voyager. (*Id.* ¶ 27.) Lacey then gave $400 to Greathouse, who told her that he would have her financed by Tuesday or Wednesday. Lacey did not receive any additional paperwork from William Chrysler at this point. (*Id.* ¶ 28.)

Lacey called Greathouse on Wednesday, June 12, 2002, to see if financing had been arranged. Greathouse replied that he still had not heard anything regarding financing and told her that she would receive her paperwork in the mail once financing was arranged. (*Id.* ¶ 29.) Around June 20, 2002, Lacey was approved for financing by Drive Financial. (RIC) Lacey received the paperwork around June 25 or 26. The documents did not reflect credit for a trade in. (*Id.* ¶ 30.) Lacey then returned to William Chrysler to inquire as to why no trade in was reflected in the paperwork she received. (*Id.* ¶ 31.) She spoke with Hester, who was "at a loss to explain what happened." (*Id.* ¶ 32.) Lacey returned to William Chrysler again in late June. William Chrysler was unable to locate the Transport. Hester told her that "the keys were there, but the van was gone" or words to that effect. (*Id.* ¶ 34.)

By the end of June, Lacey realized that she would not be returning to work as she had expected. (Lacey Dep. at 58.) On July 13, 2002, Lacey returned to William Chrysler and attempted to return the Plymouth Voyager and get her Pontiac Transport back. (*Id.* at 64.) Hester again told Lacey that the Transport was not at the dealership and that he did not know what happened to it. He stated that William Chrysler had contacted the police to locate the van.[7] (*Id.* ¶ 35.) Neither party knows what happened to the Pontiac Transport that Lacey left at William Chrysler on June 8, 2002.

Lacey filed a consumer complaint with the Illinois Attorney General's office on July 16, 2002. (Pl. L.R. 56.1 ¶ 38.) Greathouse responded with a letter to the Attorney General's office received on August 6, 2002.[8] (Def. Ex. 7.)

On January 29, 2003, Household Automotive Finance, which had financed Lacey's purchase of the 1997 Pontiac Transport, filed a complaint in detinue in the Circuit Court of Cook County against Lacey claiming that it had been unable to secure the Pontiac Transport and seeking either a return of the vehicle or its monetary value. The case is still pending. (Pl. L.R. 56.1 ¶ 39.)

Lacey had possession of the Plymouth Voyager from June 12, 2002, through January, 2003. William Chrysler repossessed the Voyager on January 11, 2003. (Def. L.R. 56.1 ¶ 37.)

---

[7]Defendants deny this, but fail to cite to any portion of the record which contradicts the assertion. (Def. Resp. to Pl. Statement of Uncontested Facts ¶ 35.) Defendants also contend that the Hester's statement is inadmissible hearsay. (*Id.*) The statement is an admission by a party-opponent and thus is not hearsay. *See* Federal Rule of Evidence 801(d)(2). However, the statements allegedly made to Lacey by Sergeant Chambliss of the Chicago Police Department (Pl. L.R. 56.1. ¶ 36-37) are hearsay and will not be considered by the court. *See Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)("Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial.").

[8]Defendants repeatedly cite this letter as evidence contradicting Lacey's statements. However, this letter is hearsay and cannot be used to prove the truth of the matters asserted therein. *Eisenstadt*, 113 F.3d at 742.

Lacey had not made any payments on the Voyager at that point. (*Id.* ¶ 5.) Lacey's $750 check for the down payment on the Voyager was returned unpaid. The returned check has the words "Not Paid" and "Irregular Signature" stamped on its face. (*Id.* ¶ 27; Pl. Resp. to Def. L.R. 56.1 ¶ 27.)

## DISCUSSION

### I. Count I: Equal Credit Opportunity Act

In Count I, Lacey alleges that William Chrysler violated the ECOA, 15 U.S.C. § 1691, by failing to give her a written statement of the reasons that she was denied financing for the purchase of the Town & Country. The ECOA provides that "each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." A creditor satisfies this obligation by

> (A) providing statements of reasons *in writing* as a matter of course to applicants against whom adverse action is taken; or
> (B) giving *written notification* of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. §1691(d)(2)(emphases added). William Chrysler does not deny that it did not give Lacey a written statement of the reasons she did not qualify for credit for the purchase of the Town & Country. However, William Chrysler contends that it did not violate § 1691(d)(2) because it did not take an adverse action against Lacey.[9] Both parties move for summary judgment on Count I.

---

[9]William Chrysler also argues that it "gave [Lacey] oral notification, which absolves William of liability under the act." (Def. Resp. to Pl. Mot. for Summ. J., at 7.) This is clearly incorrect. Written notice is only excused if the applicant is applying for business credit, 12 C.F.R. § 202.9(a)(3) or if the creditor acts on less than 150 applications per year, 15 U.S.C. § 1691(d)(5). Neither exception applies here.

The ECOA defines "adverse action" in relevant part as "a denial or revocation of credit." 15 U.S.C. § 1691(d)(6). Regulation B, the ECOA's implementing regulation, further defines adverse action as "a refusal to grant credit in substantially the amount or on substantially the terms requested in an application . . . ." 12 C.F.R. § 202.2(c)(1)(i). William Chrysler argues that it did not take an adverse action against Lacey because, at her direction, it never submitted her credit application to a lender. To take an adverse action, "a dealership must actually submit a credit application to a lending institution with" the authority to extend or deny credit to the applicant. (Def. Resp. to Pl. Mot. for Summ. J., at 3.) The court disagrees.

First, William Chrysler's contention that Lacey directed it not to submit her credit application to a lender is not supported by the record. The undisputed facts only establish that Hester told Lacey that "she did not qualify to purchase" the Town & Country. (Pl. L.R. 56.1 ¶ 14.) As discussed above, Greathouse's statement that Lacey "chose not to attempt financing" both lacks foundation and is inconsistent with another statement in the same affidavit. *See supra* note 3.

Second, excusing a car dealership from complying with the ECOA's notice requirements because it did not submit a customer's credit application to a lender would undercut the purpose of the Act. The purpose of the ECOA is to prohibit credit discrimination in America. *See Brothers* v. *First Leasing*, 724 F.2d 789 (9th Cir. 1984). To this end, the ECOA prohibits credit discrimination by "any person who regularly extends, renews or continues credit" as well as "any person who regularly arranges for the extension, renewal or continuation of credit." 15 U.S.C. § 1691a(e). This language clearly contemplates that a "person who regularly arranges for the extension . . . of credit" may engage in discrimination apart from any action by a lender. For

example, if a person who regularly arranges for the extension of credit refuses to submit credit applications from women to third party lenders, that person violates the Act. The notification requirements of § 1691(d)(6) help prevent discrimination of this sort: "only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices." *See* S. Rep. No. 589, 94th Cong., 2d Sess. (1976), *repr. in* 1976 U.S.C.C.A.N. 403, 406. Thus, to discourage those who regularly arrange for the extension of credit from engaging in discrimination, the ECOA requires them to provide the reasons for their decisions to the credit applicant in writing. William Chrysler did not submit Lacey's credit application to a lender and failed to provide her with a written explanation of the reasons for that decision. Therefore, William Chrysler violated § 1691(d)(6).

None of the cases cited by William Chrysler supports a contrary conclusion. It is true that in each of the cases the defendant car dealership submitted the credit application to a lending institution. *See Najieb* v. *William Chrysler Plymouth*, No. 01 C 8295, 2002 WL 31906466, at 4 (N.D. Ill. Dec. 31, 2002); *Mungia* v. *Tony Rizza Oldsmobile, Inc.*, No. 01 C 460, 2002 WL 554504 (N.D. Ill. April 15, 2002); *Burns* v. *Elmhurst Auto Mall, Inc.*, No. 00 C 5732, 2001 WL 521840 (N.D.Ill. May 16, 2001). However, none of these cases holds that a dealership must submit a credit application to a lender to trigger the ECOA's notice requirements. Thus, the court grants Lacey's motion for summary judgment as to Count I.

**II. Count III: Truth in Lending Act**

In Count III, Lacey alleges that William Chrysler violated the TILA by having her sign a blank retail installment contract to purchase a Plymouth Voyager on June 8, 2002. The TILA requires, among other things, that a creditor in a consumer credit transaction disclose to the

consumer certain details of the terms of the financing agreement. 15 U.S.C. § 1638(a). For instance, the creditor must disclose the amount of money financed, the borrower's right to obtain a written itemization of the amount financed, and the finance charge. *Id.* Under the TILA and its implementing regulation, Regulation Z, 12 C.F.R. § 226.17, these disclosures must be made "clearly and conspicuously in writing, in a form the consumer may keep," and the disclosure must take place "before the consummation of the transaction." 12 C.F.R. § 226.17(a) and (b). William Chrysler does not dispute that it failed to make the required disclosures, but argues that Lacey cannot maintain a cause of action under the TILA because she never made any payments under the RIC and thus suffered no damages. Both parties move for summary judgment on Count III.

William Chrysler relies on *Streit* v. *Fireside Chrysler-Plymouth*, 697 F.2d 193 (7th Cir. 1983). In *Streit*, a car buyer brought a TILA claim against a car dealership because the dealership failed to provide the buyer with a duplicate copy of the retail installment contract at the time the parties entered into the credit transaction. The Seventh Circuit held that the dealership was not liable for "technical violations" of the TILA because the buyer was not misled nor financially harmed and the consumer unilaterally breached the contract almost immediately after it was entered. *Id.* at 197. The court noted that it had previously held creditors liable for "merely technical violations" of the TILA. *Id.* at 196. In *Smith* v. *No. 2 Galesburg Crown Finance Corp.*, 615 F.2d 407, 416 (7th Cir. 1980), for instance, the court stated that "Congress did not intend that creditors should escape liability for merely technical violations" and held that arguably inconsequential terminological deviations from the TILA's required language were violations. Similarly, in *Brown* v. *Marquette Savings & Loan Assoc.*, 686 F.2d 608, 614 (7th Cir. 1982), the

court stated that it is no defense that the consumer was neither misled nor harmed by the violation. Nevertheless, the court in *Streit* held that

> it is not necessary or appropriate to hold creditors absolutely liable for every non-compliance and to disregard completely the factual situation out of which the claim has arisen. We believe that Congress would not have intended to impose liability on a creditor for a technical violation where there never was a transaction (beyond entering into the financing agreement) because of the consumer's complete failure to fulfill his obligations under the contract. In addition, Streit substantially misstated relevant financial information (the payments outstanding on his trade-in) at the time the credit agreement was entered into. The consumer's acts were far more improper than anything the creditor did.

697 F.2d at 196. According to William Chrysler, the same is true in the instant case. Lacey suffered no damages and her failure to make payments "were far more improper than anything [William] did." (Def. Reply in Supp. of Mot. for Summ. J., at 8.)

The court disagrees. The court in *Streit* noted that its departure from the general rule that "arguably inconsequential terminological deviations from the TILA's required language [are] violations" was justified by the combination of multiple factors specific to the case:

> It would be unfair to hold Fireside liable when Streit understood the terms of the financing agreement, signed his name about a quarter of an inch below a prominent two-line sentence reciting that he received a copy of the document, and, furthermore, where he misstated the amount of money he owed on his trade-in. *Although these factors by themselves would not be sufficient to absolve a creditor from liability, they do have some significance when combined with the consumer's complete failure to fulfill his part of the bargain between the parties.*

697 F.2d at 196 (emphasis added). In the instant case, there is no such combination of factors. True, Lacey failed to make payments under the RIC. However, she clearly did not understand the terms of the financing agreement, as those terms had not yet been determined when she signed the RIC. Nor does the record indicate that Lacey misstated anything to William Chrysler. More importantly, William Chrysler's conduct--asking Lacey to sign a blank contract with no

disclosures--was far more egregious than simply failing to give the customer a duplicate copy of a contract that he admittedly read and understood, as in *Streit*. The purpose of the TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). To achieve this purpose, the Act requires creditors to disclose the details of a credit transaction to the consumer before the transaction is consummated. 15 U.S.C. § 1638(a). Far from a mere "technical violation" of the TILA, William Chrysler's action is a direct violation of the central provision of the Act and should not be excused because Lacey failed to fulfill her obligations under the contract. The court grants Lacey's motion for summary judgment as to Count III.

**III. Count IV: The Credit Repair Organization Act**

In Count IV, Lacey contends that Greathouse violated § 1679b of the CROA when he instructed Lacey to tell any finance company that called that her monthly income was $3200 and that she had made a $500 down payment on the Plymouth Voyager. Section 1679b(a)(1)(B)(ii) states, "No person may–

> (1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to–
>
> . . .
>
> (B)any person–
>
> . . .
>
> (ii) to whom the consumer has applied or is applying for an extension of credit.

William Chrysler moves for summary judgment on Count IV, arguing that Greathouse cannot be held liable under the CROA because he was not in the business of credit improvement.

being given credit for her trade-in vehicle when in fact she was not. However, the record contains no indication that Lacey's credit application was rejected. Furthermore, there is a genuine issue of material fact as to whether Lacey traded-in her Pontiac Transport. Thus, the court denies Lacey's motion for summary judgment as to Count V.

In Count VI, Lacey alleges that Greathouse violated the ICFA when he violated the Credit Repair Organizations Act by counseling Lacey to make false and misleading statements, when he had Lacey sign a blank RIC, when he represented to Lacey that she would be given credit for her trade-in vehicle, and when he made misrepresentations to the Illinois attorney general about the transaction. Again, there are genuine issues of material fact as to whether Greathouse counseled Lacey to make false and misleading statements, whether he told her she would be given credit for her trade-in vehicle, and whether Greathouse made any misrepresentations in his letter to the attorney general. Thus, the court denies Lacey's motion for summary judgment as to Count VI.

**ORDER**

For the reasons set forth above, Lacey's Motion for Partial Summary Judgment is granted as to Counts I and III and denied as to Counts V and VI. William Chrysler's Motion for Summary Judgment is denied. However, because Lacey has failed to answer or otherwise respond to defendants' counterclaim, the court enters default judgment on liability in favor of defendants on the counterclaim, with damages to be proven at trial. Final pretrial materials shall be submitted to chambers not later than Thursday, February 26, 2004. A pretrial conference is set for Friday, February 27, 2004, at 2:30 p.m. In the meantime, parties are directed to meet in a sincere effort to resolve this case before trial.

Enter: Joan H. Lefkow
JOAN HUMPHREY LEFKOW
United States District Judge

Date: February 20, 2004